436

[Nos. 45374-6-II; 45414-9-II;   Division Two.   November 24, 2015.] 47085-3-II.

THE STATE OF WASHINGTON, *Respondent*, v. ZYION HOUSTON-SCONIERS, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. TRESON LEE ROBERTS, *Appellant*.

*In the Matter of the Personal Restraint of* ZYION HOUSTON-SCONIERS, *Petitioner*.

*Zyion Houston-Sconiers*, pro se.

*Stephanie C. Cunningham* for appellant Houston-Sconiers.

*Kathryn A. Russell Selk* (of *Russell Selk Law Office*), for appellant Roberts.

*Mark E. Lindquist, Prosecuting Attorney*, and *Brian N. Wasankari, Deputy*, for respondent.

¶1 MELNICK, J. — Zyion Houston-Sconiers and Treson Roberts were jointly prosecuted for a series of robberies and other crimes committed on Halloween when they were both under the age of 18. They appeal their convictions, arguing that the "automatic decline" statute, RCW 13.04.030, which mandated that they be tried as adults and not juveniles, is unconstitutional under recent federal Eighth Amendment

jurisprudence. In the published portion of this opinion, we hold that RCW 13.04.030 does not violate the Eighth Amendment's prohibition against cruel and unusual punishment.

¶2  In the unpublished portion of this opinion, we address Houston-Sconiers's and Roberts's additional arguments, including that (1) the trial court violated their right to confront witnesses against them by admitting an out-of-court statement made by a witness who did not testify at trial; (2) insufficient evidence supported their assault in the second degree convictions and all of their firearm sentence enhancements; (3) prosecutorial misconduct deprived them of a fair trial; and (4) the trial court erred by imposing discretionary legal financial obligations (LFOs) without considering their individual ability to pay.

¶3  Additionally, Houston-Sconiers asserts in a personal restraint petition (PRP) that the trial court erred by refusing to grant him an evidentiary hearing on his motion to suppress evidence, by depriving him of his right to be present at every critical stage of the trial, and by denying his proposed missing witness instruction. He also makes additional allegations of prosecutorial misconduct.

¶4  We hold that admittance of the challenged out-of-court statement did not violate Houston-Sconiers's and Roberts's right to confront witnesses against them because the statement was nontestimonial; sufficient evidence supports their assault convictions and all of their firearm sentence enhancements; prosecutorial misconduct did not deprive them of a fair trial; and, the trial court did not err by imposing discretionary LFOs because it engaged in the required individualized inquiry about Houston-Sconiers's and Roberts's ability to pay. Accordingly, we affirm the trial court. We also deny Houston-Sconiers's PRP.

## FACTS

RCW 13.04.030—"Automatic Decline" Statute

¶5 Houston-Sconiers and Roberts were charged with and ultimately convicted of numerous crimes, including multiple robberies in the first degree. At the time they committed the crimes, Houston-Sconiers and Roberts were 17 and 16 years old respectively; however, they were tried in adult court because of the nature of the offenses with which they were charged. *See* RCW 13.04.030(1)(e)(v)(C).[1] Adult court had exclusive jurisdiction over them.

¶6 Houston-Sconiers was convicted of six counts of robbery in the first degree, one count of assault in the second degree, one count of conspiracy to commit robbery in the first degree, and one count of unlawful possession of a firearm. The jury specially found that Houston-Sconiers was armed with a firearm during five of the six robberies, the assault, and the conspiracy. Roberts was convicted of four counts of robbery in the first degree, one count of assault in the second degree, and one count of conspiracy to commit robbery in the first degree. The jury specially found that Roberts was armed with a firearm during those crimes.

¶7 The trial court followed the State's recommendation and sentenced Houston-Sconiers to an exceptional sentence of zero months' confinement for each count. It imposed the mandatory 372 months' confinement for the seven firearm sentence enhancements. The trial court also followed the State's recommendation with respect to Roberts. It sentenced him to an exceptional sentence of zero months' confinement for each count. It imposed the mandatory 312 months' confinement for the six firearm sentence enhancements.

---

[1] Under RCW 13.04.030(1)(e)(v)(C), adult court has exclusive jurisdiction over juveniles who are 16 or 17 years old on the date of the alleged offense when they commit certain alleged offenses, including robbery in the first degree.

## ANALYSIS

■ ¶8 Houston-Sconiers and Roberts argue that the automatic decline statute in combination with statutorily mandated sentencing enhancements violate both the due process clause[2] and the Eighth Amendment to the United States Constitution. They specifically argue that juveniles are treated like adults without an individualized inquiry into the nature of the offenses and the maturity of the juveniles.

¶9 Houston-Sconiers and Roberts acknowledge that our Supreme Court has previously upheld the automatic decline statute's constitutionality in *In re Boot*, 130 Wn.2d 553, 925 P.2d 964 (1996), but they argue that the reasoning on which the court relied has been rejected. They rely primarily on a series of United States Supreme Court cases that address how the Eighth Amendment's ban on cruel and unusual punishment applies to sentencing juveniles: *Roper v. Simmons*, 543 U.S. 551, 568, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Graham v. Florida*, 560 U.S. 48, 76, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); and *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

¶10 In *Roper*, the Court held that the Eighth Amendment prohibits courts from imposing the death penalty for crimes committed while a juvenile. 543 U.S. at 568. Then in *Graham*, the Court held that the Eighth Amendment prohibits a court from imposing a sentence of life without parole on a juvenile offender for a crime that is not a homicide. 560 U.S. at 82. Two years later, in *Miller*, 132 S. Ct. at 2460, the Court held that mandatory life-without-parole sentences for juvenile offenders also violates the Eighth Amendment. *Miller* requires courts to engage in "individualized consideration" of juvenile offenders facing

---

[2] Houston-Sconiers and Roberts make no arguments relying on the state constitution; therefore, we will only consider federal constitutional law. *See In re Boot*, 130 Wn.2d 553, 570 n.9, 925 P.2d 964 (1996).

life in prison without the possibility of parole. 132 S. Ct. at 2469-70. According to the Court, "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Miller*, 132 S. Ct. at 2469. The Supreme Court recognized three general differences between juveniles and adults. First, juveniles lack maturity and have an underdeveloped sense of responsibility, which leads to "recklessness, impulsivity, and heedless risk-taking." *Miller*, 132 S. Ct. at 2464. Second, juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. Third, the character of a juvenile is not as well formed as that of an adult; a juvenile's actions are less likely to be evidence of irretrievable depravity. *Miller*, 132 S. Ct. at 2464.

¶11 Houston-Sconiers and Roberts contend that these cases undermine *Boot*'s Eighth Amendment analysis. In *Boot*, our Supreme Court held that the automatic decline statute did not violate the Eighth Amendment, or either procedural or substantive due process under the federal constitution. 130 Wn.2d at 568-72. Because the defendants had neither been tried nor sentenced, the court concluded it could not scrutinize the case under the Eighth Amendment's ban on cruel and unusual punishment. *Boot*, 130 Wn.2d at 569. The court proceeded to state that the only possible Eighth Amendment issue before it related to the claim that adult court jurisdiction in and of itself constitutes punishment. *Boot*, 130 Wn.2d at 569. Our Supreme Court noted that although the parties advanced no support for such an assertion, if they did, they would have to contend with the contrary holding of *State v. Massey*, 60 Wn. App. 131, 803 P.2d 340 (1990). *Boot*, 130 Wn.2d at 569. In *Massey*, we rejected an Eighth Amendment challenge to a life imprisonment without parole sentence for a 13 year

old. 60 Wn. App. at 145-46. We reasoned that the test for whether a sentence is cruel and unusual under the Eighth Amendment balances the crime committed and the sentence imposed but does not consider the defendant's age. *Massey*, 60 Wn. App. at 145.

¶12 Eighth Amendment jurisprudence has evolved since *Boot* and *Massey*. It is now clear that age may be considered in an Eighth Amendment challenge. *Graham*, 560 U.S. at 76. Although we recognize the referenced portion of *Massey* is no longer good law, the remainder of the court's analysis in *Boot* is still valid. In other words, a successful Eighth Amendment challenge to the automatic decline statute still requires a defendant to show that this method of asserting adult court jurisdiction, in and of itself, is punishment; however, Houston-Sconiers and Roberts do not make this showing.

¶13 *Boot* also held that application of the automatic decline statute does not violate the substantive due process rights of defendants. 130 Wn.2d at 571-72. Houston-Sconiers and Roberts argue that *Roper*, *Graham*, and *Miller* undercut *Boot*'s holding that the automatic decline statute does not violate substantive due process. Neither *Roper*, *Graham*, nor *Miller* considered due process arguments; therefore, they do not undermine *Boot*'s holding on substantive due process.[3]

---

[3] However, we note that *Boot*'s substantive due process analysis does appear to be based on the outdated understanding that juveniles' lessened culpability was relevant only in capital cases. The defendant in *Boot* relied on *Thompson v. Oklahoma*, 487 U.S. 815, 838, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988), in which the United States Supreme Court held that the Eighth Amendment prohibited the execution of a person who was under 16 years old at the time of his or her offense. *Boot*, 130 Wn.2d at 571. The *Thompson* Court also endorsed the proposition that juveniles are less culpable than adults who commit comparable crimes. 487 U.S. at 835. Our Supreme Court concluded that the *Thompson* reasoning applied only to capital cases and refused to apply it to crimes not calling for the death penalty because the death penalty was thought to be qualitatively different from a sentence of imprisonment, even life imprisonment without parole. *Boot*, 130 Wn.2d at 572. Since *Boot*, the United States Supreme Court has incrementally expanded the *Thompson* rationale to categorically ban the death penalty for crimes committed as a juvenile, life without parole for a non-homicide crime

■ ¶14 Houston-Sconiers and Roberts's entire argument is that *Boot* is undermined. Even if *Boot*'s rationale is undermined to a degree that *Boot* no longer controls, Houston-Sconiers and Roberts would still need to demonstrate that their sentences violated the Eighth Amendment, either because the sentences were grossly disproportionate to all the circumstances of the particular cases, i.e., the gravity of the offenses is grossly disproportionate to the sentence, or because the sentences fit within a categorical restriction that is based on the nature of the offense or the characteristics of the offender. *See Graham*, 560 U.S. at 59-60; *see also Miller*, 132 S. Ct. at 2463. Houston-Sconiers and Roberts never explain how their sentences violate due process or the Eighth Amendment's prohibition against "cruel and unusual" punishment. U.S. Const. amend. VIII.

■ ■ ¶15 We reject Houston-Sconiers and Roberts's assertion that *Roper*, *Graham*, and *Miller* stand for the proposition that any sentencing statute that automatically treats a juvenile the same as an adult is unconstitutional. *Roper*, *Graham*, and *Miller* do not prohibit adult court from exercising exclusive jurisdiction over older juveniles who commit robbery in the first degree. Nor do they prohibit juveniles from being subject to generally applicable criminal sentencing laws unless they implicate the death penalty, life without the possibility of parole for non-homicide crimes, or mandatory life without the possibility of parole for any juvenile offenders.

---

committed as a juvenile, and mandatory life without parole sentences for any juvenile offenders. *Miller*, 132 S. Ct. at 2460; *Graham*, 560 U.S. at 76; *Roper*, 543 U.S. at 568-75.

Although the United States Supreme Court has expanded categorical restrictions on certain punishments for juveniles due to evolving standards of decency, the expansions are narrow and focus on the most severe punishments: the death penalty and life without the possibility of parole. Life-without-parole sentences " 'share some characteristics with death sentences that are shared by no other sentences.' " *Miller*, 132 S. Ct. at 2459 (quoting *Graham*, 560 U.S. at 69). Therefore, *Boot*'s substantive due process analysis is still valid, i.e., the special treatment of juveniles is limited to the express categorical rules espoused by the United States Supreme Court.

¶16  In so holding, we are aware that the legislature's enactment of the automatic decline statute predated much of the research and data relied on by the Supreme Court in *Roper*, *Graham*, and *Miller*. "These studies reveal fundamental differences between adolescent and mature brains in the areas of risk and consequence assessment, impulse control, tendency toward antisocial behaviors, and susceptibility to peer pressure." *State v. O'Dell*, 183 Wn.2d 680, 692, 358 P.3d 359 (2015) (footnotes omitted). We are also aware that many of these factors are not present in this case. Although it may be time for the legislature to take another look at the automatic decline statute, we recognize it is the role of the legislative branch of government to make these types of policy decisions. We join the Illinois Supreme Court in urging our legislature to review our automatic decline statute utilizing current scientific and sociological evidence, which indicates a need for the exercise of judicial discretion in determining the appropriate setting for juvenile cases. That court stated:

> We do, however, share the concern expressed in both the Supreme Court's recent case law and the dissent in this case over the absence of any judicial discretion in Illinois's automatic transfer provision. While modern research has recognized the effect that the unique qualities and characteristics of youth may have on juveniles' judgment and actions, the automatic transfer provision does not. Indeed, the mandatory nature of that statute denies this reality. Accordingly, we strongly urge the General Assembly to review the automatic transfer provision based on the current scientific and sociological evidence indicating a need for the exercise of judicial discretion in determining the appropriate setting for the proceedings in these juvenile cases.

*People v. Patterson*, 2014 IL 115102, 25 N.E.3d 526, 553, 388 Ill. Dec. 834 (citations omitted), *reh'g denied* (Jan. 26, 2015), *cert. denied*, 136 S.Ct. 399 (2015).

¶17  Unlike the defendants in *Roper*, *Graham*, and *Miller*, Houston-Sconiers and Roberts were not sentenced to

death or life without the possibility of parole. On the contrary, the trial court exercised its discretion and imposed exceptional sentences well below the standard ranges. It sentenced Houston-Sconiers and Roberts to zero months' confinement for the crimes themselves and imposed confinement for only the mandatory firearm sentence enhancements.

¶18 Houston-Sconiers received a sentence of 372 months' confinement for the mandatory firearm sentence enhancements on six counts of robbery in the first degree, one count of conspiracy to commit robbery in the first degree, one count of assault in the second degree, and one count of unlawful possession of a firearm. Roberts received a sentence of 312 months' confinement for the mandatory firearm sentence enhancements on four counts of robbery in the first degree, one count of conspiracy to commit robbery in the first degree, and one count of assault in the second degree.

■ ■ ¶19 The trial court sentenced both Houston-Sconiers and Roberts to confinement well short of the most severe punishments at issue in *Roper* (death penalty), *Graham* (life without parole), and *Miller* (life without parole). Houston-Sconiers and Roberts fail to show that their sentences, which were exceptional sentences below the standard range, constitute cruel and unusual punishment or otherwise violate the Eighth Amendment or due process.

¶20 In light of the presumption of constitutionality accorded to our legislature's enactments, *State v. Jorgenson*, 179 Wn.2d 145, 150, 312 P.3d 960 (2013), we hold that application of RCW 13.04.030(1)(e)(v) along with mandatory sentence enhancements does not violate the Eighth Amendment under the dictates of *Roper*, *Graham*, and *Miller*. We affirm.

¶21 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder

shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, C.J., concurs.

¶22 BJORGEN, J. (dissenting) — For crimes committed when they were 17 and 16 years old, respectively, the State charged Zyion Houston-Sconiers and Treson Roberts with multiple counts of first degree robbery and other offenses and alleged that each was armed with a firearm while committing the crimes. With that, RCW 13.04.030(1)(e)(v)(A) required that the juvenile court decline jurisdiction and that the defendants be tried in adult criminal court. The jury found the defendants guilty of a number of the charged counts and found that each was armed with a firearm during a number of the crimes. With that, RCW 9.94A.533 required the court to sentence Houston-Sconiers to 31 years' confinement, and Roberts to 28 years' confinement, for the firearm enhancements alone. The mandatory declination of juvenile court jurisdiction thus led, in these circumstances of guilt, to the mandatory forfeiting of a 17 year old's freedom for the next 31 years of life. To effectively close off a life in this manner, as though by the workings of a machine, offends the logic, although not the holdings, of a series of recent United States Supreme Court decisions. Under that logic, the mandatory declining of juvenile court jurisdiction cannot be reconciled with the Eighth Amendment to the United States Constitution. For that reason, I dissent.

¶23 In 1988, the United States Supreme Court decided *Thompson v. Oklahoma*, 487 U.S. 815, 108 S. Ct. 2687, 101 L. Ed 2d 702 (1988), which set aside the death sentence for a murder committed at age 15. The four-justice plurality concluded that the cruel and unusual punishment prohibition of the Eighth Amendment prohibits the execution of a person who was under 16 years of age at the time of the offense. Justice O'Connor concurred in the judgment, but on

the grounds that the Oklahoma statute specified no minimum age at which the commission of a crime could lead to the offender's execution. *Thompson*, 487 U.S. at 857-58. The following year, in *Stanford v. Kentucky*, 492 U.S. 361, 369-73, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989), the Court, relying on contemporary standards of decency and the lack of a national consensus, concluded that the Eighth and Fourteenth Amendments to the United States Consititution did not prohibit the execution of juvenile offenders for murder committed when over the age of 15 and under the age of 18.

¶24 In 1996, relying in part on *Stanford*, our state Supreme Court upheld the mandatory declination statute against an Eighth and Fourteenth Amendment challenge. *In re Boot*, 130 Wn.2d 553, 570, 925 P.2d 964 (1996). The court answered *Thompson*'s statement that "less culpability should attach to a crime committed by a juvenile," *Thompson*, 487 U.S. at 835, by noting in the context of its substantive due process analysis that *Thompson* was a capital case and holding:

> "There is no analogy between the death penalty and life imprisonment without parole. As the Supreme Court has observed, the penalty of death is qualitatively different from a sentence of imprisonment, *however long.*"

*Boot*, 130 Wn.2d at 572 (internal quotation marks omitted) (quoting *State v. Grisby*, 97 Wn.2d 493, 498, 647 P.2d 6 (1982)).

¶25 By 2005, the landscape had shifted. That year, the United States Supreme Court held that the Eighth and Fourteenth Amendments forbid executing those who were under the age of 18 when their crimes were committed. *Roper v. Simmons*, 543 U.S. 551, 578-79, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). Five years later, in *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), the Court extended the rationale of *Roper* to hold that the Eighth Amendment prohibits a sentence of life imprisonment without possibility of parole for a crime other than

homicide committed by a juvenile. Two years later, the doctrinal logic of *Roper* and *Graham* led to the holding of *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), *on remand*, 148 So. 3d 78 (Ala. Crim. App. 2013), that the Eighth Amendment prohibits mandatory sentences of life imprisonment without possibility of parole for crimes committed while under the age of 18.

¶26 From *Thompson* through *Stanford* and to *Miller*, the signature of these cases is a willingness to abandon or extend prior holdings when needed to serve their underlying rationale, a willingness informed by advancing neurological and psychological knowledge, as well as ascending standards of decency. None of these cases, however, invalidate the mandatory declining of juvenile court jurisdiction. In addition, each of them deal with the most severe penalties possible, which are not the necessary result of a mandatory declining of juvenile court jurisdiction. Nonetheless, the geology of these decisions, especially *Roper* and *Miller*, leads to the conclusion, I believe, that the mandatory declining of juvenile court jurisdiction offends the Eighth Amendment.

¶27 The Eighth Amendment right to be free of excessive sanctions, according to *Roper*, flows from the basic precept that " 'punishment for crime should be graduated and proportioned to [the] offense.' " *Roper*, 543 U.S. at 560 (alteration in original) (internal quotation marks omitted) (quoting *Atkins v. Virginia*, 536 U.S. 304, 311, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002)). In Eighth Amendment analysis, the Court has "affirmed the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Roper*, 543 U.S. at 561 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (plurality opinion)). Accordingly, the Court specified that its

beginning point is a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that

have addressed the question. These data give us essential instruction. We then must determine, in the exercise of our own independent judgment, whether the death penalty is a disproportionate punishment for juveniles.

*Roper*, 543 U.S. at 564.

¶28 After reviewing legislative enactments and other indicia of consensus, *Roper* turned to the identification of three general differences between adults and juveniles central to an Eighth Amendment analysis. First, juveniles more often display " '[a] lack of maturity and an underdeveloped sense of responsibility,' " often resulting in " 'impetuous and ill-considered actions and decisions.' " *Roper*, 543 U.S. at 569 (alteration in original) (quoting *Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993)). This susceptibility means that their " 'irresponsible conduct is not as morally reprehensible as that of an adult.' " *Roper*, 543 U.S. at 570 (quoting *Thompson*, 487 U.S. at 835). Second, juveniles "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Roper*, 543 U.S. at 569. This "vulnerability and comparative lack of control over their immediate surroundings" give juveniles "a greater claim than adults to be forgiven for failing to escape negative influences." *Roper*, 543 U.S. at 570. Finally, "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are . . . less fixed." *Id.* at 570. Thus, "it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Roper*, 543 U.S. at 570.

¶29 In finding these differences, also relied on in *Miller* and *Graham*, the Court drew on developments in psychology and neuroscience showing " 'fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.' " *Miller*, 132 S. Ct. at

2464 (quoting *Graham*, 560 U.S. at 89-90).[4] These differences, the Court recognized, both lessened a juvenile's moral culpability, *Roper*, 543 U.S. at 571, and enhanced the prospect of reformation, *Miller*, 132 S. Ct. at 2465. With these differences, each decision recognized that the penological justifications for imposing the harshest sentences were diminished for juveniles. *See Miller*, 132 S. Ct. at 2465.

¶30 *Miller* also noted that *Graham* had treated " 'juvenile life sentences as analogous to capital punishment.' " *Miller*, 132 S. Ct. at 2467 (quoting *Graham*, 560 U.S. at 89-90 (Roberts, C.J., concurring)). Accordingly, *Miller* also relied on a line of precedents demanding individualized sentencing when imposing the death penalty. *Miller*, 132 S. Ct. at 2467-68. Drawing on the difference between adults and juveniles noted above, the emerging neuroscience confirming those differences, and the individualized sentencing required in death penalty cases, *Miller* concluded that

> in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. . . . And finally, this mandatory punishment

---

[4] Our state Supreme Court has also recognized these neurological distinctions. In *State v. O'Dell*, 183 Wn.2d 680, 692 n.5, 358 P.3d 359 (2015) (alterations in original), the court noted the following recent findings:

> Terry A. Maroney, *The False Promise of Adolescent Brain Science in Juvenile Justice*, 85 Notre Dame L. Rev. 89, 152 & n.252 (2009) (collecting studies); *MIT Young Adult Development Project: Brain Changes*, Mass. Inst. of Tech., http://hrweb.mit.edu/worklife/youngadult/brain.html (last visited Aug. 4, 2015) ("The brain isn't fully mature at . . . 18, when we are allowed to vote, or at 21, when we are allowed to drink, but closer to 25, when we are allowed to rent a car."); Jay N. Giedd, *Structural Magnetic Resonance Imaging of the Adolescent Brain*, 1021 Ann. N.Y. Acad. Sci. 77 (2004) ("[t]he dorsal lateral prefrontal cortex, important for controlling impulses, is among the latest brain regions to mature without reaching adult dimensions until the early 20s" (formatting omitted)).

> disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Miller*, 132 S. Ct. at 2468. For these reasons, the Court held that imposing a mandatory life sentence without possibility for parole on juvenile offenders violates the Eighth Amendment.

¶31 Turning now to the present issue, the declining of juvenile court jurisdiction faces the defendant with a much harsher world of potential punishment, a point well illustrated by the present case. Even though the court followed the State's recommendation and sentenced each defendant to 0 months' confinement for each count, the court was required to sentence Houston-Sconiers to 31 years of imprisonment and Roberts to 28 years due to the mandatory firearm enhancements. Our Supreme Court's recent holding in *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015), that sentencing courts must consider the youthfulness of adult offenders in deciding whether to grant an exceptional downward sentence, does nothing to blunt the force of the mandatory firearm enhancements. In fact, the 0 month base sentences imposed here appear to be a largely ineffective attempt to exercise some discretion in considering the defendants' youth.

¶32 The three basic differences between adult and juvenile offenders recognized by *Roper*, *Graham*, and *Miller* are not confined to crimes that may merit the death penalty or life imprisonment without parole. The impetuousness and lack of maturity, the vulnerability to outside pressure, and the increased capacity for change and redemption each have little to do with the nature of the crime and everything to do with the neurological and psychological development of the individual. The three decisions recognized that these differences diminished the penological justifications for imposing the harshest sentences on juveniles. By their nature, these differences would also diminish the penological justifications for automatically subjecting juveniles to

many punishments fashioned for adults. As recognized by *State v. L.W.*,

> [w]hile the goals of the adult Sentencing Reform Act of 1981 (SRA) are overwhelmingly punitive, the goals of the [Juvenile Justice Act of 1977] are "more complex," reflecting an intent to protect community safety while also responding to the needs of juvenile offenders. The statute "attempts to tread an equatorial line somewhere midway between the poles of rehabilitation and retribution."

101 Wn. App. 595, 601-02, 6 P.3d 596 (2000) (footnote omitted) (quoting *State v. Rice*, 98 Wn.2d 384, 392, 393, 655 P.2d 1145 (1982) and citing chs. 9.94A, 13.40 RCW). These differences between adults and juveniles observed by the United States Supreme Court, and the recognized neurological substrate of those differences, call directly into question our law mandating that 16 and 17 year olds committing certain crimes be punished as if they were adults.

¶33 *Roper*, *Graham*, and *Miller* also rested their holdings on the fact that the most severe penalties, death and life without parole, were at stake. Using their analysis to question mandatory declination would thus stretch the rationale of those decisions well beyond the use to which they put it. Such, though, was the step taken by *Graham* and *Miller* in using *Roper*'s rationale for the death penalty to justify constitutional restrictions on life sentences without possibility of parole. *Graham* and *Miller* took that step by characterizing " 'juvenile life sentences as analogous to capital punishment.' " *Miller*, 132 S. Ct. at 2467 (quoting *Graham*, 560 U.S. at 89-90). Life without parole, the Court stated, shares "some characteristics with death sentences that are shared by no other sentences." *Graham*, 560 U.S. at 69; *Miller*, 132 S. Ct. at 2466. Imprisoning an offender until he dies, *Miller* stated, alters the remainder of his life " 'by a forfeiture that is irrevocable.' " *Miller*, 132 S. Ct. at 2466 (quoting *Graham*, 560 U.S. at 69).

¶34 Sentencing a 17 year old to 31 years' imprisonment, even with the speculative possibility of sentence reduction,

works a similar forfeiture. Walking out of prison as a 48 year old, Houston-Sconiers will have lost his richest years for experience and for growth, the years with the time and the reasons to find one's footing, the years with the most scope to shape one's future. The loss of those years is as irrevocable and as potentially deadening as is the loss of the remaining years in a life sentence. The forfeiture is of similar quality as that at stake in *Miller*.

¶35 Some crimes by juveniles may warrant such a forfeiture. The lesson of *Miller*, though, is that the Eighth Amendment does not allow the possibility of forfeitures of such magnitude to be raised automatically for crimes committed by children, as though by the touch of gear on gear. Instead, the forfeiture must be allowed through the exercise of human discretion, taking into account all that law and science tells us about the nature of juveniles and the possibility for amendment of life. Our mandatory declination statute denied Houston-Sconiers and Roberts that chance. Under the logic of *Roper*, *Graham*, and *Miller*, that denial violated the Eighth Amendment.

¶36 These United States Supreme Court decisions also eviscerate *Boot*'s foundations. *Roper* held that *Stanford*, one of the principal decisions *Boot* relied on, is "no longer controlling on this issue." *Roper*, 543 U.S. at 574. *Graham* and *Miller* repudiated *Boot*'s view that there is no analogy between juvenile life sentences and capital punishment. *Miller*, 132 S. Ct. at 2467. The *Boot* court did not have the benefit of the present state of neurological research and, understandably, did not recognize the differences between adult and juvenile offenders shown by that research. *Boot* also did not have the benefit of *Miller*'s focus on whether a mandatory punishment alters the remainder of a juvenile's life " 'by a forfeiture that is irrevocable.' " *Miller*, 132 S. Ct. at 2466 (quoting *Graham*, 560 U.S. at 70).

¶37 For these reasons, *Boot* should be deemed no longer controlling. The arc of reasoning drawn from *Roper* through *Graham* and to *Miller* does not end with the holding of the

latter. That arc leads also to the demise of mandatory declination under the Eighth Amendment.

Review granted at 185 Wn.2d 1032 (2016).